Richard BEECHING and National Education Association—South Bend, An Affiliate of the Indiana State Teachers Association, Appellants–Defendants,

v.

Carol LEVEE, Appellee–Plaintiff.

No. 71A03–0103–CV–66.

Court of Appeals of Indiana.

Feb. 28, 2002.

---

Richard J. Darko, Eric M. Hylton, Lowe Gray Steele & Darko, LLP, Indianapolis, IN, Attorneys for Appellant.

Sean E. Kenyon, Margot F. Reagan, Konopa, Reagan & Kenyon, P.C., South Bend, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Carol Levee ("Levee"), the principal of Eggleston Elementary School in South Bend, Indiana, sued Richard Beeching, the UNISERV Director,[1] and the National Education Association—South Bend ("Beeching") for defamation and tortious interference with a contractual relationship. After a jury trial, the trial court

---

1. "UNISERV is 'a delivery system used by ISTA [Indiana State Teachers Association] and NEA to provide services to local teachers.'" *Levee v. Beeching,* 729 N.E.2d 215, 228, n. 2 (Ind.Ct.App.2000) (quoting *DeBaets v. National Educ. Ass'n—South Bend,* 657 N.E.2d 1236, 1239, n. 4 (Ind.Ct.App.1995), *trans. denied* ).

granted Levee's motion for mistrial because it determined that the jury had reached an inconsistent verdict. Beeching appeals raising two issues, which we restate as:

I. Whether the trial court abused its discretion when it admitted into evidence the teachers' grievances filed against Levee by Beeching; and,

II. Whether the trial court abused its discretion when it granted Levee's motion for a mistrial.

In addition, Levee cross-appeals raising one issue, which we restate as two:

III. Whether the trial court erred when it determined, with regard to the defamation claim, that Levee was a public official and/or public figure; and,

IV. Whether the trial court erred when it determined, with regard to the defamation claim, that the issues involved were matters of public interest.

We affirm in part, reverse in part, and remand.

### Facts and Procedural History

This is the second appeal in this litigation. Many of the pertinent facts are found in *Levee v. Beeching*, 729 N.E.2d 215 (Ind.Ct.App.2000), as follows:

Levee has been the principal of Eggleston School in South Bend since the Fall of 1994. Beeching is the UNISERV Director for the NEA–South Bend, and he is married to Elaine Beeching ("Elaine"), a teacher at Eggleston. During the Spring and Fall of 1995, Levee took some actions which upset Elaine. During the Fall of 1995, Kelly Reygaert, another teacher at Eggleston, heard Elaine discussing Levee and concluded that Elaine wanted to force Levee to leave Eggleston.

Between August, 1995 and November, 1995, Elaine filed six grievances against Levee and conferred with other teachers who filed two grievances. Beeching, as the UNISERV Director, acted upon those grievances. On October 19, 1995, Beeching placed a document in each Eggleston School teacher's box stating that Levee "couldn't be trusted." These events led Bruce Stahly, Executive Director of Support Services for the South Bend Community School Corporation ("SBCSC"), Jan Putz, Executive Director of Instruction and Curriculum for the SBCSC, and Myrtle Wilson, Director of Elementary Secondary Education for the SBCSC to write a joint letter to the Executive Committee of the NEA–South Bend expressing concern that Beeching was apparently using his office "to conduct what appears to be a personally motivated attack" against Levee.

On January 23, 1996, Beeching met with Eggleston School teachers regarding the cancellation of an Internet training session that Levee had scheduled. During that meeting, Beeching called Levee a "liar" and stated that Levee "favored some staff." Thereafter, on March 6, 1996, Stahly, Putz and Wilson wrote a letter to the President of the Indiana State Teachers Association complaining about Beeching's continued personal attacks on Levee.

At the conclusion of the 1995–96 school year, Levee received a 1.5% merit increase. She had received a 3% merit increase at the close of each of the previous three school years. Levee's supervisor, Myrtle Wilson, told her that the decrease in her merit pay was due to the turmoil at Eggleston during the 1995–96 school year.

On March 20, 1996, Levee filed a complaint against Beeching and the NEA.

She sought damages for defamation, tortious interference with a contractual relationship, and intentional infliction of emotional distress. On November 3, 1997, Beeching and the NEA moved for partial summary judgment on the issues of defamation and intentional infliction of emotional distress. The trial court granted partial summary judgment in favor of Beeching and the NEA on the issues of defamation per se and intentional infliction of emotional distress but ruled that the issue of whether Levee could recover on a theory of defamation per quod should go to a jury.

On November 3, 1998, Beeching and the NEA moved for partial summary judgment on the issue of tortious interference with a business or contractual relationship. Following oral argument, the trial court entered partial summary judgment in favor of Beeching and the NEA. Levee was allowed to proceed to trial on the issue of defamation per quod. Following Levee's presentation of evidence on her claim, Beeching and the NEA moved for judgment on the evidence. After hearing arguments on the motion, the trial court entered judgment on the evidence in favor of Beeching and the NEA.

*Id.* at 218–19 (internal record citations omitted).

On appeal, we affirmed the trial court's entry of partial summary judgment on the issues of defamation per se and tortious interference with a business relationship. However, we reversed the trial court's entry of partial summary judgment on the issue of tortious interference with a contractual relationship and the trial court's entry of judgment on the evidence on Levee's claim of defamation per quod. *Id.* at 224. The case was remanded back to the trial court for proceedings consistent with our opinion.

A jury trial was held on Levee's claims of tortious interference with a contractual relationship and defamation on January 29, 2001, through February 2, 2001. Prior to trial, Beeching filed two motions in limine requesting that the trial court exclude from evidence the teachers' grievances filed against Levee. The motions were denied. At trial, the trial court admitted the grievances into evidence. Beeching objected on several grounds, including that the Indiana Education Employment Relations Board ("IEERB") had previously ruled that the filing of a grievance is a protected activity.

During the final instructions, the jury was instructed that Levee had to prove actual malice in order to prevail on her claim of defamation. Levee objected to this instruction because she disagreed with the trial court's finding that she was a public official and/or public figure or that the issues involved were matters of public interest.

The jury found in favor of Levee on her claim of tortious interference with a contractual relationship and awarded $850 plus attorney fees and court costs, but zero punitive damages. However, the jury also signed a verdict form, which stated "We, the jury, find for the defendants Richard Beeching and National Education Association—South Bend, and Plaintiff, Carol Levee take nothing by way of her complaint." Appellant's App. p. 10–c. Levee therefore argued that the verdict was inconsistent and asked the trial court to declare a mistrial. Levee's motion for a mistrial was granted. Beeching appeals. Additional facts will be provided as necessary.

## I. Admission of Grievances

■ Beeching argues that the trial court abused its discretion when it admitted the teachers' grievances filed against Levee into evidence over his objection.

The admission or exclusion of evidence is a determination entrusted to the discretion of the trial court. *Paullus v. Yarnelle*, 633 N.E.2d 304, 307 (Ind.Ct.App.1994), *trans. denied.* We will only reverse a trial court's decision for an abuse of that discretion, which occurs when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before it. *Id.*

Beeching argues that the grievances were inadmissible at trial because the IEERB has ruled that the filing of grievances, even if baseless, is a protected activity.[2] He also contends that "Levee's attempt to use the grievances as evidence for her tort claims is preempted by the Certificated Educational Employee Bargaining Act ("the CEEBA")."[3] Br. of Appellant at 11–12. Finally, he argues that allowing the teachers' grievances to be used as evidence could have an extreme "chilling effect" on a teacher's right to file grievances.

Levee argues that Beeching has waived this issue because he moved to admit five of the grievances into evidence. In fact, Beeching obtained admission of five grievances into evidence before Levee attempted to offer any of the grievances. Tr. pp. 188, 194, 196–98.

A party cannot invite error and then request relief on appeal based upon that ground. *See Crowl v. Berryhill*, 678 N.E.2d 828, 830 (Ind.Ct.App.1997). An error invited by the complaining party is not subject to review by this court. *Id.; see also, City of Lake Station v. Rogers*, 500 N.E.2d 235, 239 (Ind.Ct.App.1986) (holding that error in the admission of evidence at trial is waived on appeal when the complaining party submits evidence to substantially the same effect). By seeking and obtaining admission of five grievances into evidence, Beeching invited error and waived this issue for appeal.

However, waiver notwithstanding, we will consider this issue on its merits because of its importance when or if this case is retried and to school employees in general. The CEEBA provides that

> [t]he citizens of Indiana have a fundamental interest in the development of harmonious and cooperative relationships between school corporations and their certificated employees. Recognition by school employers of the right of school employees to organize, and acceptance of the principle and procedure of collective bargaining between school employers and school employee organizations, can alleviate various forms of strife and unrest.

Ind.Code § 20–7.5–1–1(a) & (b) (1998). The IEERB has determined that under the CEEBA, "[t]he filing of grievances, whether or not baseless, is a protected activity under [section] 6(a) of the Act." Appellant's App. p. 37. Section 6(a) provides:

> School employees shall have the right to form, join, or assist employee organizations, to participate in collective bargaining with school employees through representatives of their own choosing, and

---

2. During the course of the proceedings, Beeching filed a motion to dismiss arguing that Levee was required to exhaust her administrative remedies under the Certified Educational Employees Bargaining Act, and her failure to do so deprived the trial court of jurisdiction. The motion to dismiss was denied; however, the trial court determined that the IEERB had primary jurisdiction to determine whether the class grievances were baseless and whether the filing of grievances was a protected activity. The trial court deferred to the IEERB for a determination of those issues. Appellant's App. pp. 27–32.

3. *See* Ind.Code § 20–7.5–1 (1998 & Supp. 2000).

to engage in other activities, individually or in concert for the purpose of establishing, maintaining, or improving salaries, wages, hours, salary and wage related fringe benefits, and other matters as defined in sections 4 and 5 of this chapter.

Ind.Code § 20–7.5–1–6(a) (Supp.2000). A protected activity is "conduct that is permitted or encouraged by statute or constitutional provision, and for which the actor may not be legally retaliated against." Blacks Law Dictionary 1238 (7th ed.1999). Under this statutory and regulatory structure, an Indiana school teacher, who has the benefit of a grievance structure, cannot be sued for intentional interference with a contractual relationship for filing a grievance, without broader publication of its content, because that conduct is a "protected activity."

■ In his position as UNISERV director, part of Beeching's job description is to receive and file grievances for the teachers of Eggleston Elementary School and to represent their interests. A union representative might become reluctant to file a grievance on behalf of a teacher, if the grievance could later be used against him as evidence as the trial court allowed in this case. Also, a teacher noting the union representative's reluctance to file a grievance and represent his or her interests, might determine that attempting to file a grievance would be a pointless endeavor. This would be contrary to the intent of CEEBA, which establishes that teachers have the right to file grievances. *See* Ind. Code §§ 20–7.5–1–4 & –6(a) (1998 & Supp. 2000). If courts allow grievances to be used as evidence against the filing teacher or union representative without proof of broader publication, in effect, the teacher may be penalized for exercising his or her right to file the grievance under CEEBA, and this could have a "chilling effect" on the filing of grievances. We therefore find that, absent waiver or proof of broader publication of the content of the grievances at issue, the trial court abused its discretion when it admitted any of the grievances into evidence.

## II. Mistrial

■ Beeching also argues that the trial court erred when it granted Levee's motion for a mistrial because the trial court determined that the verdicts were inconsistent. Granting a mistrial lies within the sound discretion of the trial court, and we afford the trial court's decision great deference on appeal. *Archer v. Grotzinger,* 680 N.E.2d 886, 888 (Ind.Ct.App.1997). However, mistrial is an extreme remedy and should be granted only when no other less drastic measure can rectify the perilous situation. *Stone. v. Stakes,* 749 N.E.2d 1277, 1279 (Ind.Ct.App.2001).

At trial, the jury returned the following verdicts:

### VERDICT FOR PLAINTIFF

### TORTIOUS INTERFERENCE WITH CONTRACT CLAIM

We, the jury, find for the Plaintiff, Carol Levee and against the Defendants, Richard Beeching and the National Education Association—South Bend, on her claim for tortious interference with her contractual relationship with her employer, in the sum of $850 plus attorneys' fees and court costs.

. . . .

### VERDICT FOR THE DEFENDANTS

We, the jury, find for the Defendants, Richard Beeching and the National Education Association—South Bend, and that the Plaintiff, Carol Levee, take nothing by way of her complaint.

Appellant's App. pp. 10–a, 10–c.[4] After the trial court read the verdicts, the following exchange took place:

MR. DARKO: We don't believe the verdict is inconsistent.

THE COURT: Could you explain to me what you believe the verdict is for, Mr. Darko?

MR. DARKO: We believe the verdict is for $850. Attorney fees and costs are not elements of damage.

THE COURT: And the verdict form that is filled out verdict for the defendants, how do you understand that?

MR. DARKO: To be a verdict for the defendants.

THE COURT: On?

MR. DARKO: I thought you said defamation.

THE COURT: Apparently we should have [had] further discussion on our verdict forms.

. . . .

MS. REAGAN: Your Honor, the plaintiff moves for a mistrial based on the inconsistent verdict and—a verdict that includes attorney fees and court costs.

Appellant's App. pp 16–19. After further discussion, the trial court granted Levee's motion for mistrial.

In *Cedars ex rel. Cedars v. Waldon,* 706 N.E.2d 219, 223 (Ind.Ct.App.1999), we stated:

Although courts indulge every reasonable presumption in favor of the legality of a verdict, a verdict may be overturned if it is legally or logically inconsistent, contradictory or repugnant such that no judgment can be pronounced upon it. Accordingly, a court should not enter judgment upon a verdict that is so ambiguous or contradictory that the jury's

intentions in rendering it cannot be ascertained.

(Internal citations omitted). Here, the jury completed two verdict forms, one specific to the claim of tortious interference with a contract and one general form that was titled "verdict for the defendants." The jury's verdict for the plaintiff on the tortious interference claim conflicts with the general verdict for the defendants. Under these facts and circumstances, the trial court did not abuse its discretion when it determined that the verdicts were inconsistent and granted Levee's motion for a mistrial.

### III. Levee as a Public Official and/or Public Figure

In her cross-appeal, Levee argues the trial court erred when it found that, for the purposes of her defamation claim, she was a public official and/or public figure. In *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the United States Supreme Court held that a public official may not recover damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice." However, not every public employee is a public official. *Hutchinson v. Proxmire,* 443 U.S. 111, 119 n. 8, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

[T]he "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.... Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance

---

4. The jury also awarded zero punitive damages to Levee. Appellant's App. p. 10–b.

of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, ... the New York Times malice standards apply.

*Rosenblatt v. Baer*, 383 U.S. 75, 85–86, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In *Rosenblatt*, the Supreme Court also stated that "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* at 86 n. 13, 86 S.Ct. 669.

This rule was extended to public figures in *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The United States Supreme Court has established two classes of public figures: general-purpose and limited-purpose public figures. *Journal Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 454 (Ind. 1999) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 333, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

> General purpose public figures are those individuals who "achieve such pervasive fame or notoriety that [they] become [ ] a public figure for all purposes and in all contexts." Consequently, "absent clear

evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." In the case of limited purpose public figures, they achieve their status by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."

*Id.* (Internal citations omitted). The United States Supreme Court has stated that "[i]t is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997.

 Whether an individual is a public official or public figure is a question of law. *Bandido's*, 712 N.E.2d at 454 (citing *Rosenblatt*, 383 U.S. at 88, 86 S.Ct. 669). Indiana has not considered the issue of whether the principal of a public school is a public official. Although several other states have considered the issue, no consensus has developed.[5]

---

**5.** Georgia, Illinois, Ohio, and South Carolina have determined that a principal is not a public official; therefore, the "actual malice" standard does not apply. *See Ellerbee v. Mills*, 262 Ga. 516, 422 S.E.2d 539, 540 (1992); *McCutcheon v. Moran*, 99 Ill.App.3d 421, 54 Ill.Dec. 913, 425 N.E.2d 1130, 1133 (1981) (principal sued janitor employed at the same school for defamation after janitor accused her of battery and criminal charges were brought against her); *East Canton Educ. Ass'n. v. McIntosh*, 85 Ohio St.3d 465, 709 N.E.2d 468, 475 (1999) (principal sued the school district and the school board for defamation where school superintendent wrote a letter recommending that principal's contract should be terminated for, among other things, immorality and said letter was ratified by the school board); *Goodwin v. Kennedy*, 347 S.C. 30, 552 S.E.2d 319, 327 (Ct.App.2001) (assis-

tant principal brought defamation against minister for two statements minister made referring to principal as a "house nigger" in connection with principal's role in the discipline of an African–American student). However, Louisiana, Maryland, Massachusetts, New York, Tennessee, and Vermont have reached the opposite result, concluding that principals are public officials and the actual malice standard applies. *See State v. Defley*, 395 So.2d 759, 761 (La.1981) (school supervisor is a public official); *Kapiloff v. Dunn*, 27 Md.App. 514, 343 A.2d 251, 258 (1975) (principal sued for defamation to recover for injury to his reputation due to alleged libelous newspaper article in which he was rated "unsuitable" for his position); *Andreucci v. Foresteire*, 1998 WL 1184151, *4 (Mass.Dist.Ct.1998) (retired principal sued school superintendent for

In *Palmer v. Bennington School Dist., Inc.*, 159 Vt. 31, 615 A.2d 498 (1992), the Bennington School District, Inc. sued twenty-two individuals, including the superintendent, when it discovered a two million dollar deficit in the school district. *Id.* at 499. After an audit, Bennington School District added Palmer, an elementary school principal within the district, as a defendant because the auditing firm discovered that Palmer had been certifying that the superintendent's son worked thirty hours per week for the school district when, in fact, he worked only twenty hours per week. *Id.* Palmer asserted, as a counterclaim, two counts of defamation. *Id.* The Vermont Supreme Court used the definition of public officials set forth in *Rosenblatt* and determined that a public elementary school principal was a public official. *Id.* at 501. The court based its decision on its belief that public education plays a crucial role in American society and that "education is perhaps the most important function of state and local governments." *Id.* (quoting *Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954)). The court rejected Palmer's argument that he was not renowned in the community and that his was just one of twelve elementary schools in the region stating that "it is the public's interest in Palmer's position in government, not his personal notoriety, that pertains to the designation of public official." *Id.* at 502.

However, relying on the reasoning in *New York Times v. Sullivan*, the Georgia Supreme Court reached the opposite conclusion in *Ellerbee v. Mills*, 262 Ga. 516, 422 S.E.2d 539 (1992). In *Ellerbee*, a high school principal sued a former teacher for libel and slander alleging that the teacher made false allegations concerning his performance as principal. *Id.* at 539. Finding that "implicit in the reasoning of New York Times is the concept that the people should be free to question and criticize those who govern them," that court held that

> under normal circumstances, a principal simply does not have the relationship with government to warrant "public official" status under New York Times. Principals, in general, are removed from the general conduct of government, and are not policymakers at the level intended by the New York Times designation of public official.

*Id.* at 540.

We recognize that the education of Indiana's children is an important function of our state government. Article VIII, Section 1 of the Indiana Constitution provides:

> Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the

allegedly defamatory statements regarding his conduct as principal made by the superintendent and published in a newspaper article); *Jee v. New York Post Co., Inc.*, 176 Misc.2d 253, 671 N.Y.S.2d 920, 924 (1998) (principal sued newspaper for defamation following publication of articles critical of her performance); *Junior–Spence v. Keenan*, 1990 WL 17241 *4 (Tenn.Ct.App.1990) (principal sued television station and reporters for allegedly defamatory statements made during a series of newsbroadcasts); *Palmer v. Bennington School Dist., Inc.*, 159 Vt. 31, 615 A.2d 498, 503 (1992). Also, some federal courts have considered this issue. *See Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir.1988) (Principal sued president of parent teacher association for nine allegedly defamatory statements she made during a public meeting about the principal. The court determined that a principal is a public official, but not a public figure); *Johnson v. Robbinsdale Indep. School Dist. No. 281*, 827 F.Supp. 1439, 1443 (D.Minn. 1993) (Principal sued students' parents who wrote a letter critical of principal's conduct. "[P]ublic school principals criticized for their official conduct are public officials.")

General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, . . . equally open to all.

Within a public school in Indiana, the principal has a great deal of authority. For example, a principal is the "chief administrative officer" of a school. Ind. Admin Code tit. 511, r. 5–3–1(f) (2001). Principals have the authority to hire, transfer, suspend, lay off, promote, discharge, and discipline school employees. *See* Ind.Code. § 20–7.5–1–2(h) (1998). "A principal may take any action concerning the principal's school or a school activity within the principal's jurisdiction that is reasonably necessary to carry out or prevent interference with an educational function or school purposes." Ind.Code § 20–8.1–5.1–5 (1998). Principals also have the authority to write regulations governing student conduct. *Id.* Additionally, to the general public, a principal is perceived to have responsibility and authority for operating a school and overseeing the education of its students.

On the other hand, we note that under Indiana law the only publicly elected, local school officials are school board members. *See* Ind.Code § 20–4–8–18 (1998). While these elected school board members could easily be determined to be "public officials" because of their elective office, building principals are at least two employment levels removed from school board members. In most, if not all Indiana public school systems, building principals are appointed by system superintendents and ratified by vote of the system's school board. Under these circumstances, we hold that public school principals are not "public officials" under *New York Times Co. v. Sullivan.*[6]

■ Here, Levee's defamation action is nothing more than an outgrowth of an employment dispute within grievance procedures. Beeching held a meeting with the teachers at the school to discuss the reasons that an in-service training session had been cancelled. At the meeting, he told the teachers that Levee was a liar, and that she could not be trusted. The issues involved in this defamation action do not concern broader education issues of public concern, but merely an internal, work-place dispute; therefore, the trial court erred when it determined that Levee was a public official under the facts and circumstances of this case.

Also, Levee is not a public figure. There is no evidence in the record to suggest that Levee had achieved fame or notoriety in the community. *See Bandido's,* 712 N.E.2d at 454. Nor is she a limited purpose public figure. There is no evidence that the public was aware of the turmoil between Levee, Beeching, and the teachers at Eggleston. *See id.*

### IV. Matter of Public Interest

Levee also argues in her cross-appeal that the trial court erred when it found that issues involved in this case were matters of public interest. In *Rosenbloom v. Metromedia Inc.,* 403 U.S. 29, 43–44, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the United States Supreme Court extended "constitutional protection to all discussion and communication involving matters of public or general concern without regard to whether the persons involved are famous or anonymous."

---

**6.** Upon close review of the cases noted in footnote number 5, it is apparent that the more meaningful consideration in defamation actions involving public school employees, and perhaps appointed public employees in general, is whether the conduct at issue and its context rise to the level of a matter of public interest. *See Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 43–44, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety.

*Id.* at 43, 91 S.Ct. 1811. Our supreme court adopted this rule in *Journal–Gazette Co., Inc. v. Bandido's, Inc. See Bandido's,* 712 N.E.2d at 452; *see also Aafco Heating & Air Conditioning Co. v. Northwest Publ'ns, Inc.,* 162 Ind.App. 671, 679, 321 N.E.2d 580, 586 (1974). Additionally, in *Aafco,* we determined that

[e]very citizen, as a necessary part of living in society, must assume the risk of media comment when he becomes involved, whether voluntarily or involuntarily, in a matter of general or public interest. It has long been recognized that "exposure of the self to others in varying degrees is a concomitant of life in a civilized community."

*Aafco,* 162 Ind.App. at 682, 321 N.E.2d at 588 (quoting *Time, Inc. v. Hill,* 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967)).

Beeching argues this is a matter of public concern because "the state of Indiana's public schools are of utmost importance to the public, and that schools must account to the public for their performance." Reply Br. of Appellant at 20. Furthermore, he cites to Indiana Code section 20–7.5–1–1(a) which provides that "the citizens of Indiana have a fundamental interest in the development of harmonious and cooperative relationships between school corporations and their certified employees." Levee, however, argues that Beeching's statements did not concern matters of public interest, but were merely work-place disputes. Additionally, Levee argues that these incidents were not a matter of public interest because they never garnered media attention and "neither her students nor their parents were aware of this situation." Br. of Appellee at 17.

■■■ As we stated above, we find that this was merely a work-place dispute between Levee and a group of teachers at the school. There is no evidence in the record indicating that the education of the students at Eggleston Elementary School was affected by the incidents that led to these proceedings. In addition, there is no evidence that anyone outside of the school corporation was aware of Beeching's comments or the tension between Levee and the teaching staff. The trial court therefore erred when it found that this was a matter of public interest so as to invoke the higher defamation standard in *Bandido's.*

### Conclusion

The trial court abused its discretion when it admitted into evidence the teachers' grievances filed against Levee. Also, the trial court erred when it found that Levee was a public official/figure and/or that this was a matter of public interest. However, the trial court did not abuse its discretion when it granted Levee's motion for a mistrial.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

RILEY, J., concur.

KIRSCH, J., concurs in part and dissents in part with opinion.

KIRSCH, Judge, concurring in part and dissenting in part.

I respectfully dissent from the majority's decision that the trial court was within

its discretion in granting a mistrial because it determined that the jury verdicts were inconsistent. As to the remaining issues, I fully concur.

In *Cedars ex rel. Cedars v. Waldon*, 706 N.E.2d 219, 223 (Ind.Ct.App.1999), cited by the majority, we said that courts should "indulge every reasonable presumption in favor of the legality of the verdict" which should be overturned only "if it is legally or logically inconsistent, contradictory or repugnant such that no judgment can be pronounced upon it." Here, the jury was provided with verdict forms and instructed that it must decide two claims—the defamation claim and the tortious interference with contract claim. It returned two verdict forms. The one clearly stated that it found for the plaintiff on the tortious interference claim. The other stated that it found for the defendant without reference to either claim. From these two forms, it may be reasonably inferred that the jury intended to return a verdict for the plaintiff on the tortious interference claim and against the plaintiff on the defamation claim. Indeed, it is the only logical conclusion that can be drawn. Thus, I do not believe the verdict is legally or logically inconsistent, nor is it so contradictory or repugnant that no judgment can be pronounced upon it. Indulging every reasonable presumption in favor of the verdict, I would hold that it is not inconsistent and that the trial court erred in granting a mistrial on this basis.